KINDER *v.* MILLER.

5-3272                                          382 S. W. 2d 372

[Rehearing Denied October 26, 1964.]

Opinion delivered September 21, 1964.

*Williams & Gardner,* for appellant.

*Robert E. Irwin* and *W. H. Schulze,* for appellee.

CARLETON HARRIS, Chief Justice. On February 19, 1963, Anna Belle Martin Miller, appellee herein, entered into an agreement to sell 302 acres of land, located in Pope County, Arkansas, to Chester U. Kinder and J. C. Kinder, his son. On the above date, the parties met at the Bank of Russellville, and J. C. Kinder, by check, made a $200.00 down payment. Upon the face of the check was written, ''Earnest Money on Purchase Price of 302 acres of land on Pea Ridge, Pope County, Arkansas, 5-1-1963.'' Mrs. Miller endorsed the back of the check as follows: ''2-19-63, I agree to furnish Abstract up to date with good and merchantable title to said 302 acres land on Pea Ridge for the sum of an additional $14,800.00 to be paid on 5-1-1963.'' On the same day, the two Kinders and Mrs. Miller went to the Farmers Home Administration, an agency of the United States

Department of Agriculture, for the purpose of the Kinders applying for a loan to enable them to purchase the property. As a prerequisite to obtaining consideration for Kinder's loan application, the parties executed an instrument entitled, "Option to Purchase Real Property."[1] Kinder was not approved for the loan, and this information was conveyed to Mrs. Miller; however, appellant told Mrs. Miller that he and his son were endeavoring to make arrangements; that "we have another deal on for it." Subsequently (on April 23), Kinder took a man by the name of Monroe Davis to see Mrs. Miller. Davis testified that he and appellee reached an agreement on the purchase of the place; that he was to pay $2,000.00 down at the time the deeds were executed, $500.00 per month for the next six months, and thereafter he would pay $2,000.00 a year until the full amount of $15,000.00 had been paid. He stated that out of the first $2,000.00 payment made to Mrs. Miller, $200.00 would be given Mr. Kinder (the refund of the earnest money payment the Kinders had made). Mrs. Miller confirmed that a conversation took place with Davis and Kinder, but she stated that no definite arrangement was made. Admittedly, no written contract was entered into between these parties. Appellee testified that Kinder said that he could not get the money, and that he was surrendering his rights in the option to Davis.

"He said he was turning it over to Mr. Davis and him and Mr. Davis would work out the two hundred dollars between them if me and Mr. Davis could work out a deal between us on the payment."

According to Monroe Davis, Mrs. Miller was to have the abstract brought up to date and notify him when this was done; thereafter, he intended to take the abstract to his attorney.

On May 1, Mrs. Miller entered into a written contract with Charles Reed and Foster C. Davis, whereby

---

[1] The instrument was executed by Mrs. Miller as "seller" and by Chester Kinder and wife as "buyers." J. C. Kinder did not sign since the agency apparently would not permit more than one of the parties to make application for the loan.

she agreed to sell them the land. On May 6, Chester Kinder directed a letter to Mrs. Miller, advising that he accepted the offer contained in the option, and was ready to pay the purchase price upon delivery of the abstract, certified to date, together with proper deed. This notice was received by Mrs. Miller on May 8. Suit was instituted by Chester Kinder and wife against Mrs. Miller seeking specific performance. Reed and Foster Davis intervened, setting up that they had entered into a contract with appellee to purchase the property for the sum of $15,000.00. On trial, the court found for appellee, holding that the petition of the Kinders for specific performance should be dismissed for want of equity, but giving judgment in favor of the appellants against Mrs. Miller for the sum of $200.00. The court further held that the intervenors (Reed and Foster Davis) were entitled to enforce their contract of May 1, 1963, against the appellee. From the decree so rendered, appellants bring this appeal.

Mr. and Mrs. Kinder predicate their cause upon the "Option to Purchase Real Property," which was executed at the office of the Farmers Home Administration on February 19. The clauses relied upon by appellants read as follows:

"4. The Seller agrees to pay all expenses of title clearance including, if required, abstract or certificate of title or policy of title insurance, continued down to the date of acceptance of this option and thereafter continued down to and including date of recordation of the deed from the Seller to the Buyer, * * *

"8. This option may be exercised by the Buyer, at any time while the offer herein shall remain in force, by mailing, telegraphing or delivering in person a written notice of acceptance of the offer to ANNA BELLE MARTIN MILLER at Box 725 in the city of Russellville, County of POPE, State of ARKANSAS. The offer herein shall remain irrevocable for a period of 2 months from the date hereof and shall remain in force thereafter until (1) year from the date hereof unless earlier termi-

nated by the Seller. The Seller may terminate this offer at any time after the 2 months' irrevocable period provided herein by giving to the Buyer ten (10) days written notice of intention to terminate at the address of the Buyer. Acceptance of this option by the Buyer within ten (10) days after such notice is received by him shall constitute a valid acceptance of the option.''

Appellants point out that no abstract was ever delivered, and contend that, since the offer was never terminated in writing by Mrs. Miller, the Kinders had until February 19, 1964, to exercise the option; that they actually exercised it in writing on May 6, 1963 (when the notice of acceptance was mailed to Mrs. Miller).

It is quite apparent that the Kinders must rely almost entirely upon the option to purchase, and we accordingly first discuss the validity of that instrument. After careful consideration, we are of the view that this option was, at the time of the acceptance by appellants, totally inoperative. The option seems clearly to have been given solely for the purpose of permitting the Kinders to apply for a loan from the Farmers Home Administration. The instrument is a printed Government form, and certain of its provisions emphasize the requirements of the F.H.A. Section 2 of the option provides:

''2. *This option is given to enable the Buyer to obtain a loan insured or made by the United States of America, acting through the Farmers Home Administration,*[2] United States Department of Agriculture, and its duly authorized representatives, (hereinafter called the ''Government''), for the purchase of said property. It is agreed that the Buyer's efforts to obtain such a loan constitute a part of the consideration for this option.''

In fact, Section 4 concludes by providing, ''Title evidences will be obtained from persons and be in such form as the government shall approve.'' Section 6 provides:

''6. The Seller further agrees to convey said property to the Buyer by general warranty deed (except

---

[2] Emphasis supplied.

where the law provided otherwise for conveyances by trustees, officers of courts, etc.) in the form, manner and at the time required by the Government, conveying to the Buyer a valid, unencumbered, indefeasible fee-simple title to said property meeting all requirements of the Government; * * *''

We think, from a study of the language quoted, that when the government loan to Mr. Kinder was disapproved, the option relied upon by appellants became valueless, and ineffectual.[3]

The transaction between the parties is therefore controlled by the notations on the check given on February 19. According to the writing on the face of the check, the Kinders were given until May 1, 1963, to complete the transaction, and under the wording of the endorsement, the $14,800.00 was to be paid to Mrs. Miller on that date. It is true that the abstract was never furnished to either Kinder or Monroe Davis (though appellee had sent it to Vance Abstract Company to be "brought up to date"), but the record does not reveal that either man again contacted appellee in an effort to obtain the abstract prior to May 1, nor did either offer Mrs. Miller the purchase price before that date.[4] As

---

[3] It is not clear whether the loan was rejected in March or in April.

[4] The transcript makes it clear that Monroe Davis was familiar with the notations on the check, and that he was aware of the fact that the May 1 date was particularly important. From the transcript:

"Q. All right, sir. Did you check at the abstractor's office before you left Russellville that afternoon? To see whether or not the abstract had been—
A. No, sir. It was a few days after that.
Q. All right, when did you check?
A. A few days before the 1st of May.
Q. All right, sir. And where?
A. I checked over at Vance's office.
Q. And did you learn that the abstract was there?
A. Mrs. Vance uh—
Q. You can't tell what she told you.
A. Yes.
Q. The abstract had been delivered there to be brought up to date?
A. Right.
Q. Has that abstract ever been delivered to you for examination?
A. No, sir.

stated, Kinder was evidently relying upon the provision of the option, heretofore discussed, and which we have determined to be nugatory.

This appeal is somewhat puzzling, inasmuch as it appears from the testimony that Kinder's original interest in promoting a sale was only for the purpose of recovering the $200.00 which had been paid at the outset as earnest money; he so testified;[5] in fact, this finding was made by the trial court, and Kinder was given judgment for $200.00.

The trial court's dismissal of the complaint was based on somewhat different reasoning from that herein set out, the Chancellor finding that appellants had abandoned any rights that they might have had under the option. Certainly, there was evidence to indicate a lack of desire on the part of the Kinders to pursue any possible rights under the purported option to purchase the property, and, in fact, even under Chester Kinder's own testimony, it is difficult to understand whether Mrs. Miller was to sell the property to Kinder, or to Monroe Davis. From Chester Kinder's testimony:

Q. Now, Mr. Davis did you make several inquiries about the abstract?
A. I did.
Q. When?
A. Shortly before the first of May.
Q. All right, sir. Why the first of May?
A. Uh—I knew about the check that Mr. Kinder had given her.
Q. That's this two hundred dollar check?
A. Right. And that's all I knew about it.
Q. Did you know that it had on it the date, first of May?
A. Right.
Q. And that's what you were worried about?
A. Right.
Q. All right, sir. And did you inquire about the abstract?
A. I did.
Q. And from whom?
A. Mrs. Vance.
Q. And did you also inquire from Mrs. Miller?
A. Yes, on the 5th day of May."

[5] Chester Kinder testified that he was no more interested in Monroe Davis getting the place than in somebody else getting it, but that he expected to get his $200.00 back through a sale to Davis.

"Q. Now did Mr. Davis understand at that time—you were talking with him and Mrs. Miller—that he was going to get the land from Mrs. Miller?

A. He was buying through me, but he was making the payments to Mrs. Miller, yes.

Q. And the terms were two thousand dollars down, didn't you say?

A. That's what him and Mrs. Miller agreed on that date.

Q. Did you go along with that?

A. Yes.

Q. All right, he was going to pay five hundred dollars a month for a certain period of time, didn't you say?

A. Yes.

Q. Did you go along with that?

A. Well it was alright with me. I told him any deal him and Mrs. Miller made on the terms would be all right with me." * * *

Subsequently, however, he testified:

"I told Mr. Davis—this is what I told Mr. Davis—I told him if anything interfered if he wasn't going to get the place, under the trade him and Mrs. Miller made, even at the last hour, to let me know it and I was going to take the place."

Also, it would appear that if Kinder had wanted to purchase the property himself, financial arrangements could have been made with Mrs. Miller for he testified:

"After we came out of the bank and was going to her car—she says, 'I can't think of everything, but I could have sold you boys this place and financed it myself.'"

There was also testimony by Charles Reed that J. C. Kinder had told him that the Kinders were not buying the place; that "if you want to, go ahead and buy it."

J. C. Kinder denied that such a statement had been made, and the testimony is conflicting in several respects throughout the record, but the Chancellor, of course, had the opportunity to view the witnesses, and hear their testimony.

At any rate, as previously stated, we hold that when the Kinder application for the loan was disapproved, the option was without effect, and we further find that appellants did not comply with the provisions of their agreement, *viz*, to pay the balance of the $15,000.00 to appellee on May 1, 1963.

Affirmed.